COOK, Justice.
The City of Mobile appeals from a judgment declaring that an ordinance passed by the Mobile City Council was invalid. We affirm.
This dispute began when Saad Development Corporation, owned by Gregory Saad, began planning to develop a 12-acre parcel of property owned by JCC, L.L.C., that is, the Jewish Community Center, a “limited liability company” (hereinafter “JCC”). The property is located in the City of Mobile. At the outset, the 12-aere parcel (“the JCC property”) was located in an area zoned for residential use. On July 24, 1995, Gregory Saad filed with the Mobile City Planning Commission an “Application for Amendment to the Zoning Ordinance.” In it he sought action rezoning the JCC property to “B-l (Buffer Business)” and “B-2 (Neighborhood Business), upon which a restaurant is a permitted use.” Brief of Appellant, at 1. The application also contained a provision stating:
“11. DESCRIBE BRIEFLY THE CONTEMPLATED USE AND CHARACTER OF IMPROVEMENTS TO BE CONSTRUCTED ON THIS PROPERTY:
■ “Construct a Restaurant on Lot 1 and a Professional Office Park on Lots 2 & 3.”
(Emphasis added.)
Gregory Saad then sent letters dated July 26, 1995, to owners of property adjacent to, or in the neighborhood of, the JCC property, one of which was Cardinal Woods Apartments, Ltd. (“Cardinal Woods”). Those letters stated in pertinent part:
“I am writing in an effort to provide you with information regarding the zoning and subdivision applications submitted by my company to the City of Mobile for the above referenced property. It is our goal to provide you with as much information as is reasonably possible and to make myself available to address your questions regarding these applications.
“The property consists of approximately twelve acres of land which is currently being used by the YMCA as a day camp on a temporary basis. In the years past, this property was part of a larger parcel which was known as the ‘Highland Country Club.’
“Our application for subdivision is requesting a three lot subdivision. As outlined on the enclosed plat, Lots 1 and 2 each have approximately 230 feet on Airport Boulevard. Lot 1 is planned for a specialty retail development for small specialty retail shops. Lots 2 and 3 are planned for professional office use. The office development is currently planned to provide approximately 60,000 square feet of office space located on Lot 3, which is considered the rear parcel. Lot 2 is being requested for B-l and will be a landscaped parking area.
[[Image here]]
“I will be at the Jewish Community Center on August 10, 1995, between 7:00 pm and 9:00 pm so that I can meet you and address your questions in the event you and I have not had an opportunity to discuss the applications prior to this date. However, please feel free to call me at 478-7223 if you wish to discuss the applications. I want you to know that I am a lifetime resident of Mobile and I have a vest *50 ed interest in helping to develop our community in a positive way.”
(Emphasis added.)
The record contains two additional letters concerning the same subject matter, one dated August 8, 1995, addressed to Kerry Heg-wood, and one dated August 12, 1995, addressed to Bill Gillerlain. The August 8 letter, like the July 26 letter, referred to the proposed development only as a “professional office project” and a’ “retail project.” The letters indicate that neighborhood meetings were held to discuss Saad’s proposals. Also, in a letter dated July 28, 1995, the Planning Commission notified neighborhood property owners of a “public hearing [to be held] on August 17, 1995, ... to consider [Saad’s] application.”
At the August 17, 1995, meeting of the Planning Commission, the three letters dated July 26, 1995, August 8, 1995, and August 12, 1995, were discussed. The parties refer to these three letters as “letters of agreement.” Brief of Appellees, passim; see also Brief of Appellant, at 17-18.
On August 18, 1995, the Planning Commission issued Saad a “Letter of Decision,” stating in pertinent part:
“At its meeting on August 17, 1995, the Planning Commission considered your request for a change in zoning from R-l to B-l and B-2 for retail shops and professional offices. After discussion it was decided to recommend the approval of this change in zoning to the City Council subject to the following conditions:
“(1) submission and approval of a PUD application for the entire site;
“(2) provision of buffer protection along the north, east and west property lines, including a 15’ buffer along the east property line;
“(3) provision of a 6’ privacy fence along the east property line;
“(4) developer to be responsible for turn lane and deceleration lane improvements;
“(5) limited to thé revised site plan submitted at the meeting, as required to be revised by this approval;
“(6) design modifications for realignment of the drive to be worked out with the Traffic Engineering Department;
“(7) compliance with- the letters of agreement as submitted by the applicant at the meeting.”
(Emphasis added.)
On September 8, 1995, and again on September 15, 1995, notices were published in the Mobile Press Register, stating in pertinent part:
“NOTICE OF HEARING “ON PROPOSED AMENDMENT TO THE “ZONING ORDINANCE
“Notice is hereby given that the City Council of Mobile proposes to consider the adoption of the attached amendment to the Ordinance adopted on the 16th day of May 1967, and known as the ‘Zoning Ordinance.’ The adoption of such amendment will be considered by the City Council of Mobile in the Auditorium of the Government Plaza, located at 205 Government Street, Mobile, Alabama, on the 3rd day of October 1995, at 12:00 noon. At such time and place, all persons who desire shall have an opportunity to be heard in opposition to, or in favor of the amendment. Furthermore, the City Council at this public hearing may consider zoning classifications other than that sought by the applicant for this property.
[[Image here]]
“BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF MOBILE AS FOLLOWS:
[[Image here]]
“The classification of said property is hereby changed ... to B-l Buffer Business (Parcel 1) District and B-2, Neighborhood Business (Parcel 2) District, and it shall hereafter be lawful to construct on such property any structures permitted by the ... Zoning Ordinance, and to use said premises for any use permitted by the terms of said Ordinance in B-l, Buffer Business (Parcel 1) District and B-2, Neighborhood Business (Parcel 2) District, provided, however, that the plans for any *51 structure or building sought to be erected on said property shall be in compliance with the building laws of the City of Mobile, and that any structure shall be approved by the Building Inspector of the City of Mobile, and that any such structure be erected only in compliance with such laws, including the requirements of said Zoning Ordinance ..., and further provided, however, that no lot or parcel of land hereinabove described shall be used for any use allowed in a B-l, Buffer Business (Parcel 1) District and a B-2, Neighborhood Business (Parcel 2) district until all of the conditions set forth below have been complied with: (1) submission and approval of a Planned Unit Development application for the entire site; (2) provision of buffer protection along the North, East and West property lines, including a 15’ buffer along the East property line; (3) provision of a 6’ privacy fence along the east property line; (4) developer to be responsible for turn lane and deceleration lane improvements; (5) limited to the revised site plan submitted at the meeting, as required to be revised by this approval; (6) design modifications for realignment of the drive to be worked out with the Traffic Engineering Department; (7) compliance with the letters of agreement as submitted by the applicant at the [Planning Commission] meeting."
(Emphasis added.)
In a letter dated October 2, 1995, from Saad to Councilmember Bess Rich, Saad stated: “Enclosed you will find a- copy- of the draft of the document which outlines, the key issues regarding [the JCC property] as these issues relate to my meetings and conversations with some of the neighbors.” Enclosed was a document dated October 3, 1995, which, of course, was to be the date of the Council meeting. The one-page document contained seven short paragraphs briefly discussing (1) “lighting,” (2) “deliveries and noise control,” (3) “ingress and egress,” (4) “sign criteria,” (5) “fencing and landscaping,” (6) “trees,” and (7) “storm water detention.” Nowhere in the correspondence with Coun-cilmember Rich was there a reference to any particular use of the property.
The City Council did meet on October 3, 1995. At approximately 10:30 a.m., in a “pre-Council meeting,” the Council amended the ordinance that had been advertised. Specifically, it deleted the seventh provision, which had read: “(7) compliance with the letters of agreement as submitted by the applicant at the meeting.” In its place, it substituted a new provision: “(8) compliance with the letters of agreement as submitted by the applicant and dated October 3, 1995.” At noon, at its regular meeting, the City Council adopted “Ordinance 64-048,” which included the amendment drafted earlier that morning.
The following statement of a sequence of events is taken directly from Cardinal Woods’s complaint initiating this action:
“19. On or about November 12, 1996, Saad submitted a Planned Unit Development Application to the City of Mobile Planning Commission, which application indicated that the B-2 Zone was to be developed for use as a restaurant.
“20. Shortly after Saad’s submission of its Planned Unit Development Application, The Mobile Press Register reported Saad’s intention that the B-2 Zone was to be developed for use as a Roadhouse Grill restaurant. This was the first time [Cardinal Woods] was ever made aware of Saad’s intentions to develop the B-2 Zone for use as a restaurant.
“21. At a public hearing held on or about December 5, 1996, the City of Mobile Planning Commission, over the objections of many individuals and organized neighborhood groups, approved Saad’s application for a Planned Unit Development as submitted.
“22. On or about December 16, 1996, [Cardinal Woods] and certain other organized neighborhood groups appealed the City of Mobile Planning Commission’s approval of Saad’s application for a Planned Unit Development to the Mobile City Council.
“23. At a public hearing held on or about January 14, 1997, the Mobile City Council overruled the appeal of the City of Mobile Planning commission’s approval of Saad’s Planned Unit Development.”
*52 On January 21,1997, Cardinal Woods sued the City, seeking a judgment declaring, among other things, that Ordinance 64-048 “is invalid inasmuch as proper notice was not given as required by ... [Ala.Code 1975, §§ 11-52-77, and -78].[1] JCC intervened in the action as a defendant, on the ground that it had leased the JCC property to Roadhouse Grill,. Inc. All parties moved for summary judgments in their favor. On July 1, 1997, the trial court entered a summary judgment in favor of Cardinal Woods, holding that Ordinance 64-048 was “invalid inasmuch as The City of Mobile failed to properly advertise such ordinance prior to its enactment in compliance with Sections 11-52-77 and -78.” The City appealed that judgment.
Cardinal Woods contends that the ordinance was invalid, because, as adopted, it varies significantly, Cardinal Woods contends, from the advertised version. Cardinal Woods contends, in effect, that Ordinance 64-048 differs so substantially from the published notice that the publication failed to afford the quality of notice required by § 11-52-77. It asserts that the “letters of agreement,” dated July 26, August 8, and August 12, 1995, were, in the Planning Commission meeting on August 17, 1995, “incorporated into the proposed amendment to the zoning ordinance.” Complaint, at ¶ 12. Nowhere in the letters, in the neighborhood meetings, or in the Planning Commission meeting, Cardinal Woods states, did Saad suggest that it intended to operate a “restaurant” on the JCC property. We agree with Cardinal Woods on this point.
Section 11-52-77, Ala.Code 1975, provides in pertinent part:
“No ordinance shall be passed by any municipal corporation under the authority of this article unless and until the municipal governing body has complied with the procedures set forth in either subdivision (1) or subdivision (2) of this section.
“(1) Prior to adoption, the proposed ordinance shall be published in full for one insertion and an additional insertion of a synopsis of the proposed ordinance, one week after the first insertion, which synopsis shall refer to the date and name of the newspaper in which the proposed ordinance was first published; both such insertions shall be at least 15 days in advance of its passage and in a newspaper of general circulation published within the municipality, or, if there is no such newspaper, then by posting the proposed ordinance in four conspicuous places within the municipality, together with a notice stating the time and place that the ordinance is to be considered by the municipal legislative authorities and stating further that at such time and place all persons who desire shall have an opportunity of being heard in opposition to or in favor of such ordinance.
[[Image here]]
“(3) No such ordinance shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard.”
Section 11-52-78 states:
“Such regulations, restrictions and boundaries and ordinances passed under the authority of this article may from time to time be amended, supplemented, changed, modified or repealed.
“The provisions of Section 11-52-77 relative to public hearings and official notices shall apply equally to all changes and amendments.”
In the July 26 letter, Saad spoke only of “small specialty retail shops” and “professional office use.” In the August 8, letter, Saad again spoke of the “proposed professional- office project [and] the retail project.” To illustrate this point further, we offer the following quote from the minutes of the Planning Commission meeting:
“North side of Airport Boulevard, 125’ ± west of Highland Woods Drive East. The request for a change in zoning from R-l to B-l and B-2 for retail shops and professional offices was considered.
“The plan illustrates the 11.7± acre, 3-lot site. Shown on the plan is the proposed development which consists of a re *53 tail building and associated parking on lot 1, a three building office development connected by covered walkways and associated parking on lot 2, and a supplementary parking facility on lot 3. Access to the site is to be via a main entrance drive located in approximately the center of the site and a two-way drive located at the west end of the site.
[[Image here]]
“Mr. Greg Saad, owner of Saad Development Corporation, was present in this matter. Mr. Saad stated that the request is for a change in zoning to B-l for approximately ten acres of the subject property and B-2 zoning on slightly less than two acres. Mr. Saad gave some background information on this site and stated that they intend to build and lease to a specific user. This particular user requires 30,000 sq. ft. initially and potentially up to 60,000 sq. ft.
“Mr. Saad further stated that they have made an effort to inform the neighborhood of this project. On July 26, he sent out a letter that gave an overview of the project and requested a meeting on August 10, and has followed up with several additional neighborhood meetings.
[[Image here]]
“[Saad] further pointed out the area requested for B-l zoning and the area requested for B-2. He stated that the proposed B-2 zoning (for the western lot only, away from the residential area) will be buffered by the proposed B-l. In the B-2 zoned area there mil be approximately 10,500 sq.ft, of specialty retail shops, such as a deli, a ladies’ hair salon and a men’s clothing store. Mr. Saad further stated that the project is designed for a total of 60,000 sq. ft. The parking ratio for the total site far exceeds the requirements of the Zoning Ordinance.
[[Image here]]
“In regard to delivery and noise control, Mr. Saad stated that in a letter to one of the neighbors they made a commitment to having restrictions regarding the hours for deliveries and noise control. In addition, he stated that, he has made a commitment to set up a committee of those individuals abutting the property to work with him to make sure that these issues will be addressed. He submitted copies of all correspondence that addressed these issues.
• “Ms. Barbará Kohrman stated that she moved to the area 18 years ago and was opposed to B-2 Zoning. Ms. Kohrman stated that one of the developers in Mobile who was at the meeting on August 10 agreed with what Mr. Saad said but later put his house on the market. She did not object to the B-l zoning. Ms. Kohrman described the traffic situation and was concerned that this development would result in a lot of traffic.
“In rebuttal, Mr. Saad stated that he did not know someone had put their house on the market. He pointed out that the small B-2 zoning area is clearly buffered by the B-l. He said they are planning a nice small project that should blend in well with area.
[[Image here]]
“A motion was made by Mr. Anderson and seconded by Mr. Ball to recommend the approval of this change in zoning to the City Council....

“Ms. Rich suggested that the letters be included.

“Mr. Anderson amended his motion to include the following condition:
“(7) compliance with the letters of agreement as submitted by the applicant at the meeting;
“It was seconded by Ms. Rich. The motion carried unanimously.”
(Emphasis added.) Thus, the notices of September 8 and 15, which, incorporated by reference the letters of agreement adopted at the Planning Commission meeting, would have directed public attention to the specific uses to which they refer, namely, the “small specialty retail shops,” like the “ladies’ hair salon,” and the “men’s clothing store.” In substance, Cardinal Woods’s argument is that when the City Council deleted from Ordinance 64-048 the reference to the “letters of agreement” and replaced it with a reference to the document dated October 3, 1995, which contained no reference to any specific use, the notices of September 8 and 15 no longer satisfied § 11-52-77. This *54 change, Cardinal Woods argues, rendered Ordinance 64-048 void. We agree with this argument.
“[T]he purpose of notice statutes is to apprise fairly and sufficiently those persons who may be affected by zoning action so that they may intelligently prepare for the hearing on the matter.” 1 E. Ziegler, Jr., Rath-kopfs the Law of Zoning and Planning § 10.03, at 10-15 (1992) (emphasis added). “[NJotice that does not warn of the nature of the proposed amendment is no notice. Otherwise, such a notice, instead of informing, would actually mislead.” Id. § 10.04 (emphasis added). “One could not advertise a proposed change from residential to commercial and then zone the property industrial, since this would clearly be a misleading notice.” Id. at 10-25. “But where the change of use is clearly specified, details as to non-use restrictions, such as setbacks, or side-yards, cannot be said to be substantial in the sense that people reading the notice would be misled and induced to stay away from the hearing and not present their views.” Id. (Emphasis added.)
“[I]n adopting or amending a zoning ordinance, mandated procedural steps, especially notice requirements, must be strictly followed.” Kennon & Assocs., Inc. v. Gentry, 492 So.2d 312, 318 (Ala.1986) (emphasis in original). It is immaterial “whether any person was prejudiced by the error or omission.” Id. (Emphasis in original.) Ordinance 64-048 fails to satisfy these criteria.
The published notice stated: “Furthermore, the City Council at this public hearing may consider zoning classifications other than that sought by the applicant for this property.” (Emphasis added.) If this statement means, and the City contends that it does, that the City Council could have considered and decided to zone the JCC property for industrial use, for example, rather than for the B-l and B-2 business uses as advertised, then it is patently invalid — it simply does not apprise interested persons as to how, and for what, to prepare. Similarly, use of property for “small specialty retail shops” differs significantly from use for a Roadhouse Grill restaurant. In other words, it is a difference in use, amounting to more than a mere matter of “setbacks or side-yards.”
To be sure, Saad had the right to seek to rezone the JCC property for B-2 use, including the Roadhouse Grill restaurant. However, he and his corporation were bound to do so openly and forthrightly. Once they advertised a proposed ordinance and incorporated with the notice the letters of agreement, which set forth specifically the only uses discussed with the neighborhood residents, the City Council was limited to the uses set forth in the letters of agreement. Otherwise, the advertisements were not “notice” and the resulting ordinance was void.
That is this case. Ordinance 64-048 purports to allow, the construction of any establishment that could be operated as a B-2 business. However, the September 8 and 15 publications expressly subjected the use of the JCC property to certain provisos, one of which was “compliance with the letters of agreement as submitted by the applicant at the [Planning Commission] meeting.” These letters, of course, referred specifically to “small specialty retail shops.” Ordinance 64-048 contained no such proviso.
Additionally, because the September 8 and 15 publications — which purported to authorize Ordinance 64-048 — referred by incorporation to “small specialty retail shops,” the publications failed to alert those residents who might have opposed the operation of a restaurant on the JCC property. Thus, the “notices” tended only to “mislead.”[2] See 1 E. Ziegler, Jr., supra, § 10.04. The judgment of the trial court holding Ordinance 64-048 invalid is, therefore, affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, and LYONS, JJ., concur.
SEE, J., concurs in the result.

. The claim of Cardinal-Woods is the only one involved, in this appeal.

. Significantly, the City does not contend that the Roadhouse Grill restaurant falls within the definition of a "small specialty retail shop.”